UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| WILL HOWARD,<br><br>            Plaintiff,<br><br>v.<br><br>REDPATH USA CORPORATION,<br><br>            Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO COMPEL PRODUCTION OF KUCC INVESTIGATION REPORT (DOC. NO. 28)**<br><br>Case No. 2:24-cv-00423<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Daphne A. Oberg |

Will Howard brought this negligence action against Redpath USA Corporation after being seriously injured in an accident at Kennecott Utah Copper, LLC's underground mine.[1]  Redpath moves to compel nonparty Kennecott, which owns the mine, to produce its internal investigation report in response to a document subpoena.[2] Kennecott opposes based on claims of attorney-client privilege and work-product protection.[3]  After reviewing the report *in camera* and holding a hearing on the motion, the court took the matter under advisement.[4]  Because the report is protected by the attorney-client privilege, Redpath's motion is denied.

---

[1] (Ex. A to Notice of Removal (Compl.), Doc. No. 2-1.)

[2] (Mot. to Compel Prod. of KUCC Investigation Report (Mot.), Doc. No. 28.)

[3] (Non-Party Kennecott Utah Copper LLC's Opp'n to Mot. (Opp'n), Doc. No. 31.)

[4] (*See* Doc. Nos. 38 & 41.)

**BACKGROUND**

On November 25, 2023, while working as a geologist for Kennecott, Mr. Howard was operating a vehicle in the mine when a Redpath employee struck him with a "heavy equipment" machine.[5]  As a result, Mr. Howard's leg was amputated.[6]  That day, Redpath began investigating the accident, inspecting the equipment involved, preparing a timeline to determine a cause, and gathering witness statements.[7]

Separately, Kennecott assembled its own investigative team of Kennecott personnel and informed Redpath it would not be included on the team.[8]  Kennecott's "typical incident investigations have included participation by contractor representative(s) on the investigation team when contractor employees are directly involved in an incident."[9]  But Kennecott departed from that practice and excluded Redpath "to preserve legal privileges, given the elevated litigation exposure created" by Mr. Howard's accident.[10]  This exposure included Mine Safety and Health

---

[5] (Ex. A to Notice of Removal, Compl. ¶¶ 7–8, 10–11, 27, Doc. No. 2-1.)  Redpath was a contractor for Kennecott working at the mine.  (*Id.* ¶¶ 9–10.)

[6] (*Id.* ¶¶ 10, 27–28.)

[7] (Mot. 2–3, Doc. No. 28 (citing Ex. 1 to Mot., Unsworn Decl. of Cory Cole (Cole Decl.), Doc. No. 28-1).)  Although Redpath asserts that it conducted a "standard post-incident investigation" and did so "in tandem" with Kennecott (*id.*), the unsworn declaration Redpath cites does not support these facts.

[8] (*Id.* ¶¶ 7, 10.)

[9] (*Id.* ¶ 8.)

[10] (*Id.* ¶ 9; Ex. C to Opp'n, Cole Dep. Tr. 129:5–19, Doc. No. 31-3 (Redpath employee, Cory Cole, acknowledging this was "atypical").)

Administration (MSHA) enforcement proceedings, indemnity demands, a potential contract dispute with Redpath—and the more remote possibility of civil litigation by Mr. Howard (despite the partial statutory bar for workers compensation).[11]

On November 30, 2023, Kennecott began its investigation, which was overseen and directed by in-house counsel, Jeffrey Armington, and outside counsel, Cole Wist.[12] At the investigative team's initial meeting, Mr. Armington and Mr. Wist "advised and counseled the Team on the requirements for preserving attorney-client privilege and work product protection."[13] Although Mr. Armington and Mr. Wist were not members of the team, they were involved throughout the investigation, directing the team's make-up (including excluding Redpath) and advising the team on preserving privilege and work-product protection, interviewee selection, and investigation strategy.[14] They also participated in team sessions and communications, and controlled access to the investigation, its work product, and the investigative report.[15]

Kennecott's Chief Operations Officer, Matt Breen, led the team,[16] which conducted "the onsite portion of its investigation" during the week of December 4

---

[11] (Ex. A to Opp'n, Armington Decl. ¶ 3, Doc. No. 31-1.)  At the hearing, counsel for both Kennecott and Redpath indicated MSHA conducted its own investigation after Mr. Howard's accident.

[12] (*Id.* ¶¶ 3–5.)

[13] (*Id.* ¶ 4.)

[14] (*Id.* ¶¶ 5–6.)

[15] (*Id.*)

[16] (Ex. B to Opp'n, Decl. of Matthew Breen (Breen Decl.) ¶¶ 1, 5, Doc. No. 31-2.)

through 8, 2023.[17]  During this period, Redpath gave Kennecott's team information it had collected, including equipment inspection information and maintenance records, witness statements, shift lineup information, training documentation—and Redpath's timeline, accident recreation, and communications regarding the accident.[18]  Redpath employees also communicated with Kennecott's team.[19]  But Mr. Breen and the other members of the team "understood that the investigation was being conducted confidentially and under attorney-client privilege and did not discuss its impressions, analyses, or conclusions outside of the [team] and counsel."[20]  And "other than providing information through documents and Redpath employee witness interviews, no one from Redpath participated in the K[ennecott] investigation."[21]

After the investigation concluded, Mr. Armington limited and controlled distribution of the report the investigative team prepared.[22]  Only "select senior leaders"

---

[17] (Ex. 1 to Mot., Cole Decl. ¶ 5, Doc. No. 28-1.)

[18] (*Id.* ¶¶ 4–5.)

[19] (*Id.* ¶ 5.)

[20] (Ex. B to Opp'n, Breen Decl. ¶ 8, Doc. No. 31-2.)

[21] (*Id.* ¶ 6.)

[22] (Ex. A to Opp'n, Armington Decl. ¶ 15, Doc. No. 31-1.)

at Kennecott received copies, which Mr. Armington sent directly with his "advice and counsel" regarding the report.[23]  Redpath did not receive a copy.[24]

Four months later, Mr. Howard initiated this action against Redpath.[25]  And on September 24, 2024, Redpath served Kennecott with a subpoena for Mr. Howard's "Personnel and Payroll Records."[26]  The subpoena requested Mr. Howard's "[c]omplete personnel file," including "accident reports" and "incident reports," among other things.[27]  Kennecott responded thirty-four days later without producing the investigative report and without raising any privilege or work-product objections to this portion of the subpoena.[28]  But Kennecott objected to the subpoena to the extent Redpath listed documents it presumed were in Mr. Howard's personnel file.[29]  More than a year later,

---

[23] (*Id.* ¶ 16.)

[24] (*Id.*)  At the hearing, Kennecott represented that it created a separate report regarding Mr. Howard's accident, in accordance with federal regulations, and Redpath has a copy of that report.  Redpath did not contest these facts.

[25] (Compl., Doc. No. 2-1.)

[26] (Ex. 6 to Mot., Redpath's Sept. 24, 2024 Subpoena, Doc. No. 28-6 at 2–3.)  Where the motion's exhibits do not include uniform page numbers, references are to the CM/ECF pagination.

[27] (*Id.* at 3.)

[28] (Ex. 7 to Mot., Kennecott's Oct. 28, 2024 Resps. to Redpath Subpoena, Doc. No. 28-7.)

[29] (*Id.* at 2.)  Separately, Mr. Howard served Kennecott with a subpoena specifically requesting reports regarding the November 25, 2023 accident.  (Ex. E to Opp'n, Pl.'s Oct. 15, 2024 Subpoena 2, Doc. No. 31-5.)  Kennecott objected on attorney-client privilege and work-product grounds, and served its objections on all parties, including Redpath.  (Ex. F to Opp'n, Kennecott's Nov. 21, 2024 Resp. to Pl.'s Subpoena 2–3, 8, Doc. No. 31-6.)

Redpath contacted Kennecott for a copy of the investigation report, claiming it was the product of a joint investigation.[30]  Kennecott declined to provide it, explaining the investigation was not joint, it was conducted at counsel's direction, and the report is protected by attorney-client privilege and the work-product doctrine.[31]  Five months later, Redpath filed the present motion, claiming the report fell within the scope of records requested in the September 2024 subpoena.

### LEGAL STANDARDS

Rule 45 of the Federal Rules of Civil Procedure authorizes a party to subpoena a nonparty for documents,[32] so long as the party serving a subpoena takes reasonable steps to avoid imposing an undue burden or expense on the nonparty.[33]  If the nonparty objects, the serving party may move to compel production.[34]  The court must then consider whether the subpoena seeks information within the scope of discovery under

---

[30] (Ex. 8 to Mot., Nov. 3, 2025 Email Correspondence, Doc. No. 28-8 at 1; Ex. A to Opp'n, Armington Decl. ¶ 18, Doc. No. 31-1.)

[31] (Ex. 9 to Mot., Nov. 6, 2025 Email Correspondence, Doc. No. 28-9 at 1.)

[32] *See* Fed. R. Civ. P. 45(c)(2)(A).

[33] *See* Fed. R. Civ. P. 45(d)(1).

[34] Fed. R. Civ. P. 45(d)(2)(B)(i).

Rule 26(b),[35] which includes any nonprivileged matter relevant and proportional to the needs of the case, considering various factors.[36]

**DISCUSSION**

Redpath contends the report is not protected by attorney-client privilege or the work-product doctrine, and argues Kennecott waived those objections by failing to timely raise them.[37]  Kennecott argues it waived neither protection and both apply because the report is from a privileged internal investigation conducted under counsel's supervision to evaluate legal exposure.[38]  For the reasons explained below, the report is protected by the attorney-client privilege.[39]  And Kennecott has not waived this privilege.

A. Attorney-Client Privilege

The report is protected by the attorney-client privilege.  Because this is a diversity case arising under Utah law, Utah privilege law applies.[40]  The attorney-client privilege "protects information given by a client to an attorney that is necessary to obtain

---

[35] *See Consumer Fin. Prot. Bureau v. Integrity Advance, LLC*, No. 21-mc-206, 2022 U.S. Dist. LEXIS 126523, at *18 (D. Kan. July 15, 2022) (unpublished) (explaining that it "is well settled that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b)" (citation omitted)).

[36] *See* Fed. R. Civ. P. 26(b)(1).

[37] (Mot. 6–12, Doc. No. 28.)

[38] (Opp'n 4–12, Doc. No. 31.)

[39] As explained below, where the report is subject to attorney-client privilege, the court need not address work-product protection.

[40] *See Seneca Ins. Co. v. W. Claims, Inc.*, 774 F.3d 1272, 1275 (10th Cir. 2014); *see also* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.").

informed legal advice—which might not have been made absent the privilege."[41]  The communication must be confidential.[42]  And "the mere existence of an attorney-client relationship does not ipso facto make all communications between them confidential."[43]  Accordingly, Utah law requires a party claiming attorney-client privilege to establish: "(1) an attorney-client relationship, (2) the transfer of confidential information, and (3) the purpose of the transfer was to obtain legal advice."[44]  Based on the evidence presented, including an *in camera* review of the report, Kennecott has shown each of these elements.

### 1. Attorney-Client Relationship

First, an attorney-client relationship exists between Kennecott (the client) and Mr. Armington (in-house counsel) and Mr. Wist (outside counsel).  And, where the report indicates Kennecott's senior leadership authorized the team to conduct a confidential investigation and the report was prepared at the direction of counsel, this relationship extended to Kennecott's investigative team.[45]  Accordingly, Kennecott has shown an attorney-client relationship necessary for the report to be privileged.

---

[41] *S. Utah Wilderness All. v. Automated Geographic Reference Ctr., Div. of Info. Tech.*, 2008 UT 88, ¶ 33, 200 P.3d 643 (citation omitted).

[42] *Id.* (citing Utah R. Evid. 504(b)(1)–(2)(A) (providing that the privilege applies to "confidential communications" with counsel that are "made for the purpose or in the course of obtaining or facilitating the rendition of legal services to the client")).

[43] *Id*. (citation omitted).

[44] *Id.*

[45] *See* Utah R. Evid. 504(b)(1)–(2)(A) (providing that a "client has a privilege to refuse to disclose . . . confidential communications" between "the client or the *client's*

### 2. *Transfer of Confidential Information*

Next, Kennecott has established the report is a transfer of confidential information.  The attorney-client privilege applies "where the communication is confidential and relates to the legal services."[46]  Under Utah law, "confidential communications" means communications "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of rendition of legal services to the client or to those reasonably necessary for the transmission of the communication."[47]  Redpath challenges this element for the first time in its reply, on four grounds.[48]  Not only has Redpath waived these arguments,[49] each is uncompelling.

First, Redpath generally contends Kennecott has not shown the report contains communications protected by the attorney-client privilege.[50]  But the investigative team understood the investigation was confidential and privileged, and only discussed it with

---

*representative*" and "the legal professional" (emphasis added)); Utah R. Evid. 504(a)(7)(D) (defining "[c]lient's representative" to include an employee "authorized by the client" to disclose "confidential information concerning a legal matter to the legal professional").

[46] *See Lifewise Master Funding v. Telebank*, 206 F.R.D. 298, 302 (D. Utah 2002) (discussing Utah R. Evid. 504(b)); *see also* Utah R. Evid. 504(b) (protecting "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client").

[47] Utah R. Evid. 504(a)(9).

[48] (Redpath's Reply Mem. in Further Supp. of Mot. (Reply) 7–9, Doc. No. 34.)

[49] *See Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 986 (10th Cir. 2020) (explaining that arguments raised for the first time in a reply brief are waived and need not be considered).

[50] (Reply 7–9, Doc. No. 34.)

the team and counsel.[51]  And counsel controlled the distribution of the report, only sending it to Kennecott's senior leadership team with counsel's advice.[52]  A review of the report itself reveals communications meant to facilitate counsel's legal advice to Kennecott regarding Mr. Howard's accident.  It is apparent these communications were not intended to be disclosed to third parties.  In other words, the report contains confidential communications.

Second, Redpath argues Kennecott fails to identify employees who communicated with its investigative team for the purpose of facilitating legal advice.[53] But those communications are not at issue.  Kennecott asserts privilege over the report—the results of the investigation—that its investigative team prepared at the direction of counsel and sent directly to counsel; not statements employees made to the team.  Whether or not such statements are independently privileged,[54] the investigative team's confidential communications to counsel about those statements are protected.[55]

---

[51] (Ex. B to Opp'n, Breen Decl. ¶ 8, Doc. No. 31-2.)

[52] (Ex. A to Opp'n, Armington Decl. ¶¶ 15–16, Doc. No. 31-1.)

[53] (Reply 8, Doc. No. 34.)

[54] *See, e.g.*, *Strand v. USANA Health Scis., Inc.*, No. 2:17-cv-00925, 2021 U.S. Dist. LEXIS 135426, at *3 (D. Utah July 20, 2021) (unpublished) (explaining, in a corporate setting, communications between non-attorney employees may be privileged if it is "apparent that the communication from one employee to another was for the purpose of the second employee transmitting the information to counsel for advice" (citations omitted)).

[55] *See Munson v. Chamberlain*, 2007 UT 91, ¶¶ 14–15, 173 P.3d 848, 851 (explaining that "[a] fact is one thing and a communication concerning that fact is an entirely different thing," and that a "client cannot be compelled to answer the question, 'What did

Third, Redpath argues Kennecott has not shown that counsel created the report or that it contains counsel's advice.[56]  But the privilege does not only apply to communications from counsel to a client.  It "protects information given *by a client to an attorney* that is necessary to obtain informed legal advice,"[57] which is the case here. Kennecott's investigative team gave the report to counsel to enable counsel to provide informed legal advice (as discussed in more detail below).  The report itself need not contain counsel's advice.  It would be illogical to require a client's confidential communication to counsel to contain the legal advice sought, in order for the privilege to apply.[58]

Finally, Redpath argues that, under Utah law, other types of information in the report (e.g., photographs, measurements) constitute unprotected facts, not privileged communications.[59]  It is true "the privilege extends only to communications and not to

---

you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney" (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981))).

[56] (Reply 8–9, Doc. No. 34.)

[57] *S. Utah Wilderness All.*, 2008 UT 88, ¶ 33 (emphasis added); *see also Upjohn*, 449 U.S. at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."); *Lifewise Master Funding*, 206 F.R.D. at 302 (similarly explaining that Utah privilege law applies where a corporation "is rendered professional legal services by a lawyer or where the corporation consults a lawyer with a view to obtaining legal services").

[58] *See Lifewise Master Funding*, 206 F.R.D. at 302 (explaining that, under Utah law, the client's communication to counsel must relate to legal services).

[59] (Reply 8–9, Doc. No. 34.)

facts."[60]  But the report is largely comprised of the investigative team's confidential communications, compilations, and opinions about the investigation's underlying facts, which "is an entirely different thing."[61]  And Redpath is focused on opinions and interpretations, not facts: Redpath wants Kennecott's "opinions" about whether Redpath or Mr. Howard complied with Kennecott's policies and procedures and whether those policies and procedures were adequate to prevent an accident.[62]  Indeed, at the hearing, Redpath expressed its hope that the report will "flush out" Kennecott's thinking. In other words, Redpath seeks an answer to the question "What did you say or write to the attorney?"—which is at the core of attorney-client privilege.[63]

### 3.  The Purpose Was to Obtain Legal Advice

Finally, Kennecott has shown its investigative team provided the report to counsel for purposes of obtaining legal advice.  Redpath contends Kennecott fails to show "legal advice predominated" the investigation or report because Mr. Breen (a non-attorney) conducted the investigation, there is no evidence Mr. Armington directed it, and the report reflected Kennecott's "standard practice" based on corporate policy and federal regulations.[64]  In response, Kennecott argues the purpose of the investigation was to enable counsel to assess legal exposure and give advice regarding "foreseeable

---

[60] *Munson*, 2007 UT 91, ¶ 15 (quoting *Upjohn*, 449 U.S. at 395–96).

[61] *Id.*

[62] (Reply 7, Doc. No. 34.)

[63] *Munson*, 2007 UT 91, ¶ 15 (quoting *Upjohn*, 449 U.S. at 396).

[64] (Mot. 8–10, Doc. No. 28.)

litigation."[65]  Mr. Breen's involvement leading the investigative team, Kennecott argues, does not destroy privilege.[66]

As noted above, the attorney-client privilege protects confidential communications "made for the purpose or in the course of obtaining or facilitating the rendition of professional legal services to the client."[67]  This includes "two common scenarios" where "information is given to the attorney (1) for the purpose of forming an opinion as to the legality of a contemplated legal action or (2) for legal analysis and advice as to the particular prospective litigation."[68]  The report falls under both.  As Kennecott's counsel explains, the investigation was undertaken to enable counsel to assess and provide advice as to various forms of legal exposure Mr. Howard's accident created.[69]  These included potential litigation with Mr. Howard (to the extent not statutorily barred), regulatory proceedings with MSHA, and a contract dispute with Redpath.[70]  The report itself indicates the investigative team prepared it at the direction of counsel.  And the contents suggest it was meant to aid counsel in forming and

---

[65] (Opp'n 8, Doc. No. 31.)

[66] (*Id.* at 9.)

[67] Utah R. Evid. 504(b)(1).

[68] *Gold Standard, Inc. v. Am. Barrick Res. Corp.*, 801 P.2d 909, 911 (Utah 1990) (citation omitted).

[69] (Ex. A to Opp'n, Armington Decl. ¶ 3, Doc. No. 31-1.)

[70] (*Id.*)

providing informed legal advice and assessing legal exposure.  Accordingly, Kennecott

has shown the purpose of the report was to obtain legal advice.

Redpath's arguments do not compel a different finding.  For instance, Redpath

claims there is no evidence counsel directed the investigation.  But Kennecott enlisted

both in-house and outside counsel to oversee and direct the investigation.[71]  Both were

involved throughout the investigation, directing the team's make-up (including excluding

Redpath); advising the team on preserving privilege and work product, interviewee

selection, and investigation strategy; controlling access to the investigation, its work

product, and the report; and participating in team sessions and communications.[72]  And

upon receiving the report, Mr. Armington tightly controlled its distribution and provided

copies only to Kennecott's leadership along with his advice regarding its contents.[73]

Redpath also overemphasizes Mr. Breen's status as a non-attorney.  The fact

that Mr. Breen led the investigative team does not undermine the legal purpose of the

team's report to counsel.  Information from employees to counsel during a legal

investigation—for purposes of allowing counsel to advise the corporate client—may be

privileged where the employees know they are providing confidential information for the

---

[71] (*Id.* ¶¶ 4–5); *see also Lindley v. Life Invs. Ins. Co. of Am.*, 267 F.R.D. 382, 389 (N.D. Okla. 2010) (explaining that many courts rely on a rebuttable presumption that, "if outside counsel is involved, the confidential communication is presumed to be a request for and the provision of legal advice" (citation omitted)).

[72] (Ex. A to Opp'n, Armington Decl. ¶¶ 5–6, Doc. No. 31-1.)

[73] (*Id.* ¶ 16.)

purpose of obtaining legal advice.[74]  As discussed above, Mr. Breen explains this was the case for the members of the investigative team.[75]  The mere fact that he (and the other team members) are not attorneys is of no consequence—they were aware of the confidential nature of the investigation and the purpose of the report.[76]

Finally, contrary to Redpath's assertions, Kennecott's investigation and report were not a standard practice based on corporate policy or federal law.  Kennecott does not dispute that it has a policy for investigating accidents at the mine.  But it departed from its typical practice for Mr. Howard's accident, given the elevated legal exposure created, such as MSHA enforcement proceedings and a dispute with Redpath.[77] (Redpath acknowledged at the hearing that MSHA was also investigating Mr. Howard's

---

[74] See Utah R. Evid. 504(b)(1)–(2)(A) (providing that the attorney-client privilege extends to communications between "the client's representative" and counsel, if "made for the purpose or in the course of obtaining or facilitating the rendition of legal services to the client"); Utah R. Evid. 504(a)(7)(D) (defining "[c]lient's representative" to include an employee "authorized by the client" to disclose "confidential information concerning a legal matter to the legal professional"); see also Upjohn, 449 U.S. at 394–95 (holding that questionnaires sent by the corporate client's employees to counsel with information counsel needed to give legal advice were privileged where the employees were "sufficiently aware" the information was so "the corporation could obtain legal advice").

[75] (See Ex. B to Opp'n, Breen Decl. ¶¶ 9–8, Doc. No. 31-2 (explaining the team's members "understood that the investigation was being conducted confidentially and under attorney-client privilege and did not discuss its impressions, analyses, or conclusions outside of the Investigation Team and counsel").)

[76] See, e.g., Chevron Pipe Line Co. v. Pacificorp, No. 2:12-cv-287, 2016 U.S. Dist. LEXIS 194702, at *8 (D. Utah Feb. 22, 2016) (unpublished) (explaining that documents may be privileged if they were created as part of a legal investigation, even "where neither the creators, senders, nor the recipients are lawyers" (citation omitted)).

[77] (Ex. A to Opp'n, Armington Decl. ¶¶ 3, 9, Doc. No. 31-1.)

accident.)  And, despite typically allowing contractors to participate in investigations when their employees are involved, Kennecott excluded Redpath from its investigation.[78]  Indeed, Redpath's own employee agreed this was "atypical."[79]

In addition, while federal regulations require mine operators to investigate and create reports of accidents at their mines,[80] at the hearing, Kennecott explained it created a different report for Mr. Howard's accident to comply with these regulations. Kennecott also noted that Redpath has a copy of that report.  And Redpath did not deny either assertion.  In short, Kennecott's investigation and report were not merely standard practice based on corporate policy or federal regulations.  Kennecott has shown the purpose of the report was to obtain or facilitate legal advice.  Accordingly, the report is protected by the attorney-client privilege.  Because the attorney-client privilege applies and prevents disclosure of the report, it is unnecessary to address whether the work-product doctrine applies.[81]

B.  Waiver

As a final issue, Kennecott did not waive attorney-client privilege and the circumstances do not bar its consideration.  Under Rule 45, a nonparty served with a

---

[78] (*Id.* ¶¶ 3, 7, 10.)

[79] (Ex. C to Opp'n, Cole Dep. Tr. 129:5–19, Doc. No. 31-3.)

[80] *See* 30 C.F.R. § 50.11(b)(1)–(9).

[81] While Kennecott has shown the purpose of the report was to obtain legal advice about potential legal exposure, Kennecott has not shown "the real and imminent threat of litigation or trial" necessary for work-product protection.  *See Strand*, 2021 U.S. Dist. LEXIS 135426 at *4 (citation omitted).

subpoena has fourteen days to object.[82]  Failure to do so "typically constitutes a waiver of such objections."[83]  But in unusual circumstances and for good cause, the failure to timely object to a subpoena "will not bar consideration of objections."[84]  Such circumstances, for example, may be where the subpoena is facially overbroad, exceeds the bounds of fair discovery, or the witness is a nonparty acting in good faith.[85]

Here, Redpath's subpoena is less than clear.  It describes the records sought as "Personnel and Payroll Records" and requests Mr. Howard's "[c]omplete personnel file" including, among other things, "accident reports" and "incident reports."[86]  Kennecott did not raise a privilege objection in response.  But it did object to the extent Redpath presumed the documents listed were in Mr. Howard's personnel file.[87]  Given the language of the subpoena and its objection, Kennecott reasonably (and in good faith) believed the subpoena did not encompass the investigation report, making a privilege objection unnecessary.  In other words, Kennecott did not waive privilege.  And Redpath waited more than a year after its subpoena to directly ask Kennecott for a copy of the

---

[82] *See* Fed. R. Civ. P. 45(d)(2)(B).

[83] *Strand*, 2020 U.S. Dist. LEXIS 765, at *4 (citation omitted).

[84] *Id.*

[85] *See id.*

[86] (*See* Ex. 6 to Mot., Redpath's Sept. 24, 2024 Subpoena, Doc. No. 28-6 at 2–3.)

[87] (Ex. 7 to Mot., Kennecott's Oct. 28, 2024 Resps. to Redpath Subpoena 2, Doc. No. 28-7.)

investigation report (on the grounds that it was the product of a joint investigation).[88]

Moreover, Redpath knew Mr. Howard had contemporaneously (and specifically)

requested the report, and that Kennecott claimed privilege in response.[89]

In sum, Kennecott did not waive the attorney-client privilege over the report

where the subpoena did not directly request it.  And regardless, under the

circumstances and for good cause, it is appropriate to consider the privilege here.  As

explained above, it applies and protects the report.

**CONCLUSION**

For the above reasons, the motion to compel[90] Kennecott to produce its

investigation report is denied.

DATED this 14th day of July, 2026.

BY THE COURT:

Daphne A. Oberg
United States Magistrate Judge

---

[88] (*See* Ex. 8 to Mot., Nov. 3, 2025 Email Correspondence, Doc. No. 28-8 at 1; Ex. A to Opp'n, Armington Decl. ¶ 18, Doc. No. 31-1.)  When Redpath finally asked Kennecott for the report, Kennecott reiterated its same position as to Mr. Howard's subpoena and declined based on privilege.  (*See* Ex. 9 to Mot., Nov. 6, 2025 Email Correspondence, Doc. No. 28-9 at 1; Ex. A to Opp'n, Armington Decl. ¶ 18, Doc. No. 31-1.)

[89] (*See* Ex. E to Opp'n, Pl.'s Oct. 15, 2024 Subpoena 2, 4, Doc. No. 31-5 (specifically requesting the investigation report from Kennecott and certifying that Redpath received a copy of the subpoena); Ex. F to Opp'n, Kennecott's Nov. 21, 2024 Resps. to Pl.'s Subpoena 2–3, 8, Doc. No. 31-6 (objecting on privilege grounds, among others, and certifying that Redpath received a copy of the responses).)

[90] (Doc. No. 28.)